Nadine JAMISON, Plaintiff,

v.

Brad STORM, individually, City of Morton, a Municipal Corporation, ED English, individually and as Police Officer for the City of Morton, Washington, and George M. Harbaugh, individually and as Police Officer for the City of Morton, Washington, Defendants.

No. C04–2267Z.

United States District Court, W.D. Washington, At Seattle.

March 29, 2006.

Kevin Patrick Sullivan, Sullivan & Thoreson, Seattle, WA, Wesley N. Edmunds, Jr., Gordon Edmunds Elder, Bellevue, WA, for Plaintiff.

Edwin J. Snook, Snook Schwanz, Kirkland, WA, Robert Leslie Christie, Christie Law Group PLLC, Seattle, WA, for Defendants.

### ORDER

ZILLY, District Judge.

This matter comes before the Court on a motion for summary judgment, docket no. 19, by Officer Ed English and the City of Morton (collectively, "Defendants"). Also before the Court are Defendants' motion to strike the declaration of Brad Storm, docket no 28, and Plaintiff Nadine Jamison's motion to strike Defendants' reply brief as untimely, docket no. 31. Having reviewed Defendants' motion, Plaintiff's brief in opposition, docket no. 23, Defendants' brief in reply, and all supporting declarations and exhibits, and having heard the argument of counsel on March 24, 2006, the Court enters the following Order.

### BACKGROUND

This case arises out of a tragic automobile accident that took place at approximately 12:30 a.m. on March 24, 2001. Compl., docket no. 1, ¶ 2.1. The accident occurred when a pick-up truck driven by 20–year–old Defendant Brad Storm ("Storm") left the road and rolled down an embankment killing two of Storm's three passengers, 17–year–old Jetaime Hall ("Hall") and 25–year–old Trevor Whitlow ("Whitlow"), and injuring the third, 15–year–old Plaintiff Nadine Jamison. *Id.* Storm was subsequently convicted of vehicular manslaughter and driving under the influence. *Id.* at ¶ 2.2.

Sometime between approximately 11:20 and 11:30 p.m. on March 23, 2001, two on-duty City of Morton police officers, Defendant Officer Ed English ("Officer English") and Officer George Harbaugh, came into contact with Storm at a fueling station and mini-mart business known as the Gas Plus.[1] *Id.* at ¶ 2.6. Officer English spoke with Storm for some period of time. *Id.* at ¶ 2.7. During their encounter, Storm asked Officer English for a cigarette, Officer English asked Storm for his identification, which Storm provided, and Officer English gave Storm a cigarette and lit it for him. *Id.* While the preceding

---

1. Officer Harbaugh was dismissed with prejudice as a defendant from this action by stipulation. Docket no. 18.

facts are undisputed, some of what occurred on the night of March 23, 2001, and the early morning of March 24, 2001, is in dispute. *See* Answer, docket no. 4.

*Events Preceding the Interaction Between Storm and Officer English*

At approximately 8:00 p.m. on March 23, Storm and Whitlow arrived at Hall's grandmother's home in Randle, Washington to pick up Hall and the Plaintiff. Christie Decl., docket no. 20, Ex. B (Jamison Dep. at 79). At that point, Storm states that he consumed one beer or less. *Id.* at Ex A (Storm Dep. at 94). After leaving Hall's home, Storm, Whitlow, Hall, and Plaintiff decided to drive to a party at Swofford Pond in Mossyrock, Washington. *Id.* at Ex. A (Storm Dep. at 37–38); Storm Decl., docket no. 25, ¶ 5. Storm states that he consumed "maybe half a beer" more between picking up Hall and Plaintiff and arriving at the party. *Id.* (Storm Dep. at 94).

Storm and his passengers arrived at the Swofford Pond party sometime between 8:00 p.m. and 10:00 p.m. *Id.* (Storm Dep. at 44). At various points in his deposition, Storm testified he consumed either one beer or two beers at the party. *Id.* (Storm Dep. at 44, 94). Storm also testified that some of the beer he and Whitlow had purchased that evening had been stolen out of his truck during the party. *Id.* (Storm Dep. at 44, 96). The four stayed at the party for approximately an hour and a half before leaving for Morton. *Id.* (Storm Dep. at 44).

There is conflicting evidence as to how much alcohol Storm had consumed during the time before his arrival in Morton. On the low end, Storm states that he had one and a half beers before arriving at the party and one beer at the party, for a total of two and a half beers. However, Storm stated elsewhere in his deposition that he had two beers at the party, for a total of three and a half. Additionally, Storm

signed a declaration prior to his deposition in which he stated that he had "consumed approximately seven beers by that point in the evening." Storm Decl. at ¶ 16. When asked during the deposition whether his declaration was accurate, Storm testified:

"No. I gave you the same statement, that I had approximately four to five beers at the end of the night, and that's what I can remember now ... And yeah, like what I'm saying, two to two and a half beers to three beers, somewhere in that line is what I had at the point of where you're at right now when I got to the store." ·

Christie Decl. at Ex. A (Storm Dep. at 100). Later, when asked again, Storm testified that he "consumed five to seven beers *total, in the evening,* yeah." Sullivan Decl., docket no. 24, Ex B (Storm Dep. at 129) (emphasis added). When asked how many beers Storm had consumed, Plaintiff testified in her deposition that Storm had consumed eight beers before leaving the party and two beers before arriving in Morton, for a total of 10. Christie Decl. at Ex. B (Jamison Dep. at 100–01).

*Events During the Interaction Between Storm and Officer English*

Upon arriving in Morton, Storm and his passengers stopped at the Gas Plus Chevron station to get gasoline. Storm Decl. at ¶ 8. When they stopped at the Gas Plus, Storm recognized Officer English standing outside the entrance to the store smoking a cigarette with an Officer that Storm had never seen before. Storm Decl. at ¶ 11. Having known Officer English from "approximately six or seven" previous encounters, Storm decided that he would go "bum a cigarette from Officer English." *Id.* at ¶¶ 14–15. Storm testified that he knew Officer English from having hunted on his property once when he was 11–12 years old and having talked to Officer English

briefly on several occasions about topics such as the weather and fishing in the two years preceding the accident. Sullivan Decl., Ex B (Storm Dep. at 20–23). Storm also testified that he and Officer English would call each other by name when they ran into each other. *Id.* (Storm Dep. at 24–25).

Before speaking to Officer English, Storm "popped a couple of cough drops" in order to "dilute the smell of alcohol on [his] breath." Storm Decl. at ¶ 15. Storm testified that he then approached Officer English, who was "looking way" and "talking to the officer when [Storm] pulled up." Christie Decl., Ex. A (Storm Dep. at 111). Storm "walked over" and "tapped [Officer English] on the shoulder and asked him for a cigarette, and [they] discussed fishing or something." *Id.* (Storm Dep. at 111–12). Before giving Storm a cigarette, Officer English asked Storm how old he was and for identification, which Strom provided. Storm Decl. at ¶ 22; English Decl., docket no. 21, ¶ 4. Both Storm and English state that Storm referred to Officer English by his first name. Storm Decl. at ¶ 22 ("Ed you know how old I am"); English Decl. at ¶ 4 ("Ed, I am 20 years old, you know that"). According to Officer English: "After [Officer English] gave him the cigarette, [Officer English] spoke with Mr. Storm while [they] both smoked. When [Storm] finished his cigarette, [Storm] left and [Officer English] turned [his] attention back to [his] conversation with Reserve Officer Harbaugh." English Decl. at ¶ 5. During this interaction, Storm states that he "was a conversational distance from Ed English, less than two feet separated us." Storm Decl. at ¶ 23.

Testimony concerning the length of the interaction between Storm and Officer English varies. At the criminal trial, both Storm and Jamison testified that Storm and Officer English spoke for approximately 10 minutes. Sullivan Decl., Ex. E (Storm Testimony at 93), Ex. F (Jamison Testimony at 108). In their depositions, Jamison testified that they spoke for "at least seven minutes," while Storm testified that his best recollection was "one to five minutes." *Id.,* Ex. B (Storm Dep. at 65); Christie Decl., Ex B (Jamison Dep. at 125–26). Yet in his declaration, Storm states that he and Officer English spoke for "about ten minutes." Storm Decl. at ¶ 23. In contrast, Officer English testified that his interaction with Storm lasted "[a]bout 30 seconds, less than a minute." Sullivan Decl., Ex. D (English Testimony at Storm Criminal Trial 132).

The evidence indicating whether or not English had knowledge that Storm was intoxicated during the period when they spoke also varies. Officer English states: "During my entire interaction with Mr. Storm, I never noticed any signs of intoxication. Mr. Storm appeared cogent and sober throughout the entire encounter. I never smelled alcohol or any other intoxicants on his breath or person." English Decl. at ¶ 5. At Storm's criminal trial, Officer English testified:

Q: Now, when you contacted Mr. Storm in the hospital—you alluded to it, indicating that his level of intoxication wasn't justified with his statement of only having two beers?

A: It was not consistant [sic].

Q: Why do say you that?

A: His level of intoxication was *far greater than it was the first time I had seen him.*

Sullivan Decl., Ex. F. (English Trial Testimony at 141) (emphasis added). In his declaration, Storm states that he "was definitely buzzed when [he] spoke to Police Officer Ed English and the other Police Officer, and, looking back, [he is] sure Ed English was aware that [he] had been drinking." Storm Decl. at ¶ 24. However, in his deposition, Storm testified that he

was "not feeling under the influence of alcohol" when he stopped at the Gas Plus Chevron. Christie Decl., Ex. A (Storm Dep. at 101). In the criminal trial, Jamison testified that "Brad [Storm] was drunk" when he spoke to Officer English. Sullivan Decl., Ex. F (Jamison Trial Testimony at 85).

While Storm and English spoke, Whitlow filled Storm's vehicle with fuel and entered the Gas Plus to pay for the fuel and purchase another 12–pack of beer. Sullivan Decl., Ex. B (Storm Dep. at 55–56). Storm states that Whitlow said "Hi, Ed" when Whitlow passed Storm and English as they spoke but does not recall whether Officer English said anything in response. Id. (Storm Dep. at 66–67). In his declaration, Storm states that Whitlow "had a substantial reputation in the community for providing alcohol to minors." Storm Decl. at ¶ 21. Likewise, Officer English states that, if he'd seen Whitlow with Storm that night it would "spark [his] concern." Sullivan Decl., Ex. A (English Dep. at 100).

Both Storm and Plaintiff state that Officer English saw Plaintiff sitting in Storm's pick-up. Plaintiff states that Officer English looked past Storm into Storm's pick-up while Storm and Officer English spoke and that she made eye contact with Officer English while sitting in the pick-up. Sullivan Decl., Ex C. (Jamison Dep. at 128–29). Similarly, Storm states that he is "sure the Police Officers saw the girls inside [his] vehicle, and Mr. Whitlow as he pumped gas and returned to the vehicle." Storm Decl. at ¶ 27. Officer English states only that he "never saw Mr. Storm leave the Gas Plus (Chevron) station that evening." English Decl. at ¶ 6. At one point, Storm stated that there was nothing to suggest that Officer English knew Storm was driving on the evening of the accident. Christie Decl., Ex. A (Storm Dep. at 112). However, Storm states that Officer English had seen Storm driving in Storm's pick-up on previous occasions and would have been aware that the pick-up parked 50–60 feet away that night was Storm's. Sullivan Decl., Ex B (Storm Dep. at 132–33). Officer English's Incident Report written on the morning of the accident states that he "was standing outside having a cup of coffee when Brad Storm and a couple of girls pulled in to get fuel" and that, later, "Brad and the girls left the area." Sullivan Decl., Ex P (Incident Report at 1).

*Events Occurring After the Interaction Between Storm and Officer English*

Storm testified that after he and his passengers left the Gas Plus approximately 15 minutes elapsed until the accident. Id. (Storm Dep. at 83). Storm also testified that he consumed between one and two beers during that period. Id. (Storm Dep. at 85). Approximately five miles from the Gas Plus, Storm's vehicle left the road and rolled several times down a steep embankment. Compl. at ¶ 2.10. Hall and Whitlow were thrown from the vehicle and killed, while Plaintiff was trapped inside. Id. ¶ 2.11. With help from Storm, Plaintiff was removed from the vehicle and both managed to ascend back to the road. Id. Storm then ran for help and an ambulance arrived several hours later. Id. Storm's blood-alcohol level was taken at the hospital at 3:47 a.m. and registered at .10 BA. Sullivan Decl., Ex. O (Criminal Trial Testimony of Melissa Pemberton of the Washington State Toxicology Laboratory at 42–46). On the morning of the accident, Officer English's Incident Report was completed after he had interviewed Storm in the hospital about the accident. Sullivan Decl., Ex P (English Report).

*Plaintiff's Claims Against Defendants*

Based on Storm's interaction with Officer English at the Gas Plus, and her subsequent injuries resulting from the automobile accident occurring on March 24, 2001, Plaintiff brings the following claims

against the City of Morton and Officer English: (1) negligence against Officer English; (2) negligence against City of Morton; (3) constitutional rights violation under 42 U.S.C. § 1983 against Officer English; (4) constitutional rights violation under 42 U.S.C. § 1983 against the City of Morton.[2] Compl. at ¶¶ 4.1–7.10.

*Defendants' Motion to Strike*

■ In their Reply brief, Defendants move to strike Storm's declaration as a "sham declaration" under *Kennedy v. Allied Mutual Insurance Company*, 952 F.2d 262 (9th Cir.1991). In *Kennedy*, the Ninth Circuit stated the general rule that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Id.* at 266. However, the *Kennedy* Court also noted that courts have appropriately considered a post-deposition declaration when that declaration is merely an attempt to explain certain aspects of confused deposition testimony and, therefore, is not inconsistent. *Id.* Further, courts cannot apply the *Kennedy* rule unless they can make "a factual determination that the contradiction was actually a 'sham.'" *Id.* at 267.

This case is unique in that Storm (a defendant) had his declaration prepared by Plaintiff's counsel *before* his deposition.[3] Thus, the rules discussed in *Kennedy* are not immediately applicable because the declaration was clearly not created for the sole purpose of contradicting earlier deposition testimony, which did not yet exist. *Id.* The issue here is which of Storm's statements should be taken as true for purposes of the summary judgment analysis where there are contradictions or inconsistencies between Storm's declaration and subsequent deposition. For example, Storm stated in his declaration that he

"had consumed approximately 7 beers" when he spoke to Officer English, but when cross-examined during his deposition, Storm flatly stated "[n]o ... I had approximately four to five beers by the end of the night ... [and] two to two and a half beers to three beers, somewhere in that line is what I had ... when I got to the store." Storm Decl. at ¶ 16; Christie Decl. at Ex. A (Storm Dep. at 100).

In this case, the Court concludes that *Kennedy* does not require that the Storm declaration be stricken because, as stated in *Kennedy*, the Court cannot find that the declaration was actually a "sham." However, the Court recognizes that portions of the Storm declaration are inadmissible for lack of personal knowledge or as improper opinion testimony. The Court strikes the following statements from the Storm Declaration: (1) "... looking back, I am sure Ed English was aware that I had been drinking"; (2) "Neither Officer did their job that night"; (3) "If the Officers had done their job that night, and made reasonable inquiries and observations that even a person not trained in law enforcement would have made, none of my friends lives would have been taken, Ms. Jamison would not have been seriously injured, and I would not have spent the past three years in prison as a result." Storm Decl. at ¶¶ 24, 30, 31. Defendants motion to strike is DENIED with the exception of these statements.

*Plaintiff's Motion to Strike*

■ Plaintiff moves to strike as untimely Defendants' reply brief, which was filed on the noting date (February 10, 2006). Docket no. 31. Plaintiff's motion to strike is DENIED. *See* LR 7(d)(3) (reply papers

---

**2.** Plaintiff also brings a negligence claim against Storm, but that claim is not at issue in this motion for summary judgment. *See* Compl. at ¶¶ 3.1–3.6.

**3.** The Storm Declaration was signed on November 20, 2005. Docket no. 25. Storm's deposition was taken on December 9, 2005. Christie Decl., Ex. A.

should be filed no later than the noting date).

## DISCUSSION

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the opposing party must show that there is a genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir.1991). For purposes of this motion, reasonable doubts as to the existence of material facts are resolved against the moving parties and inferences are drawn in the light most favorable to the opposing party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.2000).

## I. Plaintiff's 42 U.S.C. § 1983 Claims

Plaintiff brings claims against both Officer English and the City of Morton for constitutional violations pursuant to 42 U.S.C. § 1983. First, Plaintiff alleges that Officer English's "failure to investigate, stop, and detain Storm violated the rights of Plaintiff as guaranteed by the Fourteenth Amendment." Compl. at ¶ 6.3. The Complaint goes on to allege that "[b]y failing to take the required action, [Officer English] affirmatively and willfully placed plaintiff in a position of danger" and that Officer English was "deliberately indifferent [to] and/or callously disregarded the Plaintiff's security, personal safety, and liberty interest." *Id.* at ¶ 6.4. Sec-

ond, Plaintiff alleges that the policy and practice of the City of Morton authorized Officer English "to disregard proper procedure and enforcement of statutory requirements regarding publicly intoxicated individuals and intoxicated drivers," which "encouraged and caused constitutional violations." *Id.* at ¶ 7.3. Plaintiff also alleges that "[t]he City of Morton had actual or constructive notice of the pervasive constitutional violations perpetrated by [Officer English]" and that the City's failure to train, direct, supervise, or control Officer English "amounted to deliberate indifference to the rights of persons with whom municipal employees came into contact." *Id.* at ¶¶ 7.5–7.6.

■ "To sustain an action under section 1983, a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff a federal constitutional or statutory right." *Wood v. Ostrander*, 879 F.2d 583, 597 (9th Cir.1989). There is no dispute in this case that Officer English was on duty when he spoke to Storm on March 23, 2001, and, therefore, acting under color of state law. Instead, Defendants move for summary judgment based on their contention that (1) Officer English is entitled to qualified immunity even if there was a violation, and (2) there was no constitutional violation by the City of Morton.

### A. Qualified Immunity as to Officer English

■ The question of whether an officer is entitled to a qualified immunity defense is subject to a two-prong inquiry. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "First, a court must determine whether— resolving all disputes of fact and credibility in favor of the party asserting the injury— the facts adduced at summary judgment

show that the officer's conduct violated a constitutional right." *Kennedy v. City of Ridgefield,* 439 F.3d 1055 (9th Cir.2006). If there is no violation, the inquiry is over and courts must grant the officer qualified immunity. However, if an officer does violate a constitutional right, courts must determine whether the violated right was "clearly established" as of the time of the alleged injury. The reviewing court "must consider whether a reasonable officer would recognize that his conduct violates [the] right under the circumstances and in light of the law that existed at the time." *Id.* at 1144. In this case, Defendants argue that Plaintiff's section 1983 claim fails as to both prongs of the qualified immunity analysis.

### 1. Did Officer English Deprive Plaintiff of a Constitutional Right?

In *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 196–97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court held that the due process clause does not guarantee the citizens of a state certain minimal levels of safety and security. In *DeShaney,* the Winnebago County Department of Social Services became aware that a child was the victim of abuse at the hands of his father after numerous reports. *Id.* at 192, 109 S.Ct. 998. During several months of observing suspicious injuries to the child, the County's caseworker did nothing to stop the physical abuse. *Id.* at 192–93, 109 S.Ct. 998. Finally, after the father beat the child so severely as to place the child in a coma and cause brain damage, the child's mother brought a section 1983 action against the County. *Id.* The Supreme Court held that the Due Process Clause did not require the County to protect the

child. *Id.* at 196–97, 109 S.Ct. 998. The Supreme Court also noted that "[w]hile the State may have been aware of the dangers that [the child] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them" and that "the State had no constitutional duty to protect [the child]." *Id.* at 201, 109 S.Ct. 998.[4] Finally, and perhaps most applicable to this case, the *DeShaney* Court stated that the "most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Id.* at 203, 109 S.Ct. 998.

 Plaintiff contends that Officer English violated her Fourteenth Amendment right to substantive due process under the "state-created danger" doctrine, which is an exception to *DeShaney* that requires Plaintiff to establish two elements: (1) the state officer's affirmative conduct placed Plaintiff in peril; and (2) the state officer acted with deliberate indifference to Plaintiff's safety. *See Wood v. Ostrander,* 879 F.2d 583, 588 (9th Cir.1989) (first recognizing liability based on state-created danger). Defendants argue that there is no evidence that Officer English undertook affirmative conduct that placed Plaintiff in danger, nor that Officer English was "deliberately indifferent" to Plaintiff's safety. Thus, to survive summary judgment on this claim, Plaintiff must demonstrate that, given all reasonable inferences in her favor, there are genuine issues of material fact as to both elements of the state-created danger doctrine.

---

4. Since *DeShaney,* the Ninth Circuit has recognized exceptions to the general rule that the state is not liable under Section 1983 for harm caused by third-party, non-state actors: (1) where there is a special relationship be- tween the state and the injured person; (2) where the state creates or enhances the danger to the injured person. Here, Plaintiff relies only on the second exception, known as the state-created danger doctrine.

### a. Whether Officer English Placed Plaintiff in Peril

The first issue is whether Plaintiff has raised a triable issue of fact as to whether Officer English's "conduct 'affirmatively placed [Plaintiff] in a position of danger'" under the state-created danger exception. *Wood,* 879 F.2d at 589–90 (citations omitted). In examining this element, courts "do not look solely to the agency of the individual, nor do [they] rest ... on what options may or may not have been available to the individual." *Munger v. City of Glasgow Police Dep't,* 227 F.3d 1082, 1086 (9th Cir.2000). Since first adopting the state-created danger exception, the Ninth Circuit has had occasion to evaluate several cases in which plaintiffs alleged that a state actor's affirmative conduct placed them in heightened danger. These cases are instructive in defining the scope of "affirmative conduct" that may be actionable under section 1983.

In *Wood,* which first adopted the doctrine in the Ninth Circuit, a police officer arrested the driver of a vehicle, impounded the car, and "apparently stranded Wood, [a passenger in the vehicle], in a high-crime area at 2:30 a.m." *Id.* at 590. The Parkland neighborhood, in which Wood was left stranded by the officer, had the highest violent crime rate in Pierce County. *Id.* at 586. Five miles from home, Wood accepted a ride with a stranger who subsequently raped her. *Id.* The *Wood* Court held that, on these facts, Wood's section 1983 could survive summary judgment.

In two cases following *Wood,* the Ninth Circuit examined the state-created danger doctrine under the Rule 12(b)(6) "failure to state a claim" standard. First, in *L.W. v. Grubbs,* the plaintiff was a nurse employed in a medium security custodial institution for young male offenders. 974 F.2d 119, 120 (9th Cir.1992). The plaintiff alleged that the defendants knowingly assigned her to work alone with an inmate who had a history of sexual violence against women and girls without informing her of this history. *Id.* at 121. During an instance when the plaintiff was working alone with the inmate, the inmate assaulted, battered, kidnapped and raped her. *Id.* at 120. On a Rule 12(b)(6) motion, the district court dismissed the plaintiff's section 1983 claim, but the Ninth Circuit reversed and held that, following *Wood,* the plaintiff had stated a claim under the state-created danger doctrine. Second, in *Penilla v. City of Huntington Park,* the police responded to a 911 call for emergency medical services. 115 F.3d 707, 708 (9th Cir.1997). The police arrived to find Penilla in "grave need of medical care" but, rather than help, the police cancelled the request for paramedics, broke into Penilla's home and moved him inside, then locked the door behind them as they left. *Id.* "The next day family members found Penilla dead on the floor inside the house." *Id.* Once again, the Ninth Circuit held that the alleged actions of the police officers constituted "affirmative conduct" under the state-created danger doctrine and declined to dismiss the claim on a Rule 12(b)(6) motion to dismiss. *Id.* at 710.

Next, in *Munger,* the police were called to a bar where Munger was acting belligerent after "consuming substantial amounts of alcohol." 227 F.3d at 1084. When the police arrived, they ejected Munger from the bar wearing only jeans and a T-shirt into temperatures of minus 20–25 degrees. *Id.* The police also told Munger he could not drive because he was intoxicated. According to the plaintiffs, Munger was "obviously drunk ... swaying back and forth, with unsure balance." *Id.* Munger was ultimately found dead of hypothermia in an ally two blocks from the bar. *Id.* at 1084–85. On the defendants' summary judgment motion, the district court concluded that Munger was not affir-

matively placed in danger by the officers. *Id.* at 1085. The Ninth Circuit reversed, holding that ejecting Munger from the bar while drunk, thinly clothed, and unable to drive placed him in a more dangerous position than the one they found him in. *Id.*

Finally, in the recently re-filed *Kennedy v. City of Ridgefield*, the plaintiff brought a section 1983 claim against a police officer when she and her husband were shot by Michael Burns, a 13–year–old whom she had accused of molesting her daughter. 439 F.3d 1055. When the plaintiff reported the alleged molestation to the police she specifically requested that the police notify her before informing Burns of the accusation, and the police promised that they would notify her. *Id.* The plaintiff also warned the police officer that Burns had a long history of violent acts. *Id.* Weeks later, the police officer informed Burns' mother of the allegations approximately 15 minutes before notifying the plaintiff that he had done so. *Id.* The police officer then promised to patrol the area around her home and keep an eye on Burns. *Id.* That evening, Burns broke into the plaintiff's home and shot her and her husband while they slept, killing her husband and injuring the plaintiff. *Id.* The *Kennedy* Court held that the "affirmative conduct" was revealing the existence of the allegations to Burns' mother without notifying the plaintiff as promised and offering false assurances that the police would patrol the neighborhood on the night of the shooting. *Id.*

The two defining principles that appear to emerge from these Ninth Circuit cases are (1) identifiable conduct by the state actor that rises to more than a mere failure to act, and (2) some contact or connection with the injured parties that creates a causal connection between the state actor's conduct and the increased danger. *See Wood* (stranding plaintiff in dangerous neighborhood late at night); *Grubbs* (as-

signing plaintiff to work alone with sexually violent inmate); *Penilla* (moving medically distressed person indoors and calling off the paramedics); *Munger* (ejecting decedent from bar while he was drunk, thinly clothed, and could not drive himself home); *Kennedy* (informing violent youth of molestation accusations after promising to notify plaintiff first without doing so and promising to provide police patrol without doing so).

In this case, Plaintiff identified Officer English's "affirmative conduct" as failing to arrest or detain Storm after they spoke in front of the Gas Plus. Plaintiff contends that "Officer English undertook to investigate by asking for Storm's identification and then, knowing Storm was underage and intoxicated, effectively encouraged Storm to continue his illegal conduct." Pl.'s Opp., docket no. 23, at 12. Additionally, Plaintiff relies on the allegation that Officer English came into contact with Whitlow and that the failure to arrest or detain Storm "emboldened Whitlow" to purchase more alcohol and, thereby, "rendered Nadine Jamison more vulnerable to the danger she was already facing with an intoxicated Storm at the wheel." *Id.*

In reply, Defendants argue that Officer English's failure to arrest or detain Storm cannot meet the definition of "affirmative conduct" and that the Plaintiff's claim fails because Officer English never came into contact with Plaintiff. Def.'s Reply, docket no. 28, at 8–10. First, Defendants argue that Officer English's behavior on the night in question is not analogous to the state actors in the cases discussed above because Officer English took no identifiable actions that placed Plaintiff in greater danger. Second, Defendants argue that nothing Officer English did was directed at Plaintiff or changed her situation for the worse; that is, before arriving at the Gas Plus Plaintiff was a passenger with an

intoxicated driver and after leaving she was in the same position.

After briefing was complete but before oral argument, the Court made the parties aware of the Second Circuit's decision in *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005). In *Pena*, various on-duty police officers consumed alcohol and drove with Grey, an off-duty officer, to and from an area bar over the course of several hours. 432 F.3d at 103. Grey's superiors knew about the drinking and driving, yet allowed it to continue. *Id.* After drinking continuously for nearly twelve hours, Grey drove through a red light striking and killing several pedestrians. *Id.* The *Pena* Court held that there was a question of fact as to whether Grey's fellow officers and supervisors "told, or otherwise communicated to, Officer Grey that he could drink excessively and drive while intoxicated without fear of punishment." *Id.* at 111. That is, the defendants may have "implicitly *but affirmatively* condoned Grey's behavior and indicated to Grey that he would not be disciplined for his conduct." *Id.* (emphasis added). While the *Pena* Court concluded that plaintiffs' complaint could satisfy the constitutional violation hurdle of the qualified immunity test, the Court ultimately held that the defendants were entitled to qualified immunity because the right was not "clearly established" as of the time of the incident (August 2001).

Plaintiff suggests that *Pena* is analogous to this case and that the Court should conclude that Officer English violated Plaintiff's constitutional rights by, in effect, implicitly but affirmatively condoning Storm's drinking and driving. However, *Pena* does not adequately support Plaintiff's argument for several reasons. First, factually, the defendants' conduct in *Pena* is far more egregious than anything that occurred in this case. *Pena* involved officers being "encouraged" to drink on police property and at least one of Grey's super-

visors asking Grey to drive them both to a bar while Grey was intoxicated. No similar conduct is at issue here. Second, the Ninth Circuit has not adopted the *Pena* Court's holding that the affirmative conduct element of the state-created danger doctrine may occur "implicitly." In each of the cases discussed above, the Ninth Circuit has required explicit and identifiable *conduct*, not simply a failure to act. Finally, the application of *Pena* is completely foreclosed because the Second Circuit held that the constitutional rule established in *Pena* was not clearly established as of August 2001. The accident in this case occurred in March 2001 and, as a result, the *Pena* rule could not have been clearly established at the time because it had not been established as of nearly five months later.

Accepting the allegations and evidence in the light most favorable to Plaintiff, Officer English was, or should have been, aware that Storm was intoxicated while they spoke for up to 7–10 minutes. Officer English was also aware that Storm was a minor and that it is illegal for a minor to be intoxicated in public or drive while intoxicated. He was also aware that Whitlow, who he knew to have provided alcohol to minors in the past, was present because Whitlow said "Hi, Ed" as he entered the Gas Plus. Finally, he knew that two girls, one of which was Plaintiff, were sitting in a pick-up truck parked 50–60 feet away in the direction from which Storm had approached him. Plaintiff states that Officer English made eye-contact with her while he spoke to Storm. While there is no direct testimony that Officer English saw Storm drive into or away from the Gas Plus, Officer English did write that Storm "pulled in to get fuel" that evening and he had seen Storm driving the pick-up on previous occasions.

■ Even with this favorable interpretation of the facts, Plaintiff has not demonstrated any "affirmative conduct" attributable to Officer English that placed her in greater peril than existed before Officer English spoke to Storm. Officer English's "conduct" that evening was limited to (1) speaking to Storm, (2) asking Storm for his identification to determine whether Storm was old enough to smoke, and (3) giving Storm a cigarette. In each of the Ninth Circuit cases discussed above, courts were able to identify a specific act attributable to the state actor that increased the plaintiffs' peril—no such act exists in this case. Simply put, an omission or failure to act is not enough to establish the first element of the state-created danger doctrine. *See DeShaney*, 489 U.S. at 196–97, 109 S.Ct. 998 (the failure to protect an individual against private violence is not a Due Process Clause violation). Defendants motion for summary judgment as to Plaintiff's section 1983 claim against Officer English is GRANTED.

### b. Whether Officer English Acted with Deliberate Indifference

■ Were the Court to conclude that Plaintiff could establish that there is an issue of fact as to the "affirmative conduct" element of the state-created danger doctrine, the next issue is whether Plaintiff can demonstrate an issue of fact as to "deliberate indifference." "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Kennedy*, 411 F.3d at 1143 (citations omitted). Plaintiff contends that Officer English's indifference is demonstrated by allowing Storm to drive off with his passengers when Officer English had knowledge that he was intoxicated. Accepting Plaintiff's statement that Officer English saw her and Hall in Storm's vehicle, Officer English was in fact aware of

Plaintiff's existence. It is also reasonable to infer that Officer English recognized that Plaintiff was with Storm that evening because she was in his pick-up truck and that there was some potential for danger to Plaintiff due to Storm's intoxication. Thus, if Officer English had undertaken affirmative conduct that increased the danger to Plaintiff, a jury could conclude that Officer English was deliberately indifferent.

### 2. Was the State–Created Danger Doctrine Right Clearly Established?

■ Even were the Court to conclude that Officer English violated Plaintiff's constitutional rights on March 23, 2001, which is not the case, the Court would still need to determine whether those rights were "clearly established" as of that night. In *Hope v. Pelzer*, the Supreme Court succinctly described the "clearly established" test as follows:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of preexisting law the unlawfulness must be apparent.
>
> . . . . .
>
> The salient question is whether the state of the law [at the time of the alleged wrong] gave [the officers] fair warning that their alleged treatment of [the injured party] was unconstitutional.

536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (citations omitted).

Citing extensively to the principles discussed in *Hope*, the *Kennedy* Court first

concluded that "it was clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced" as of 1998. 439 F.3d 1055. In *Kennedy*, the Court questioned whether the officer was on notice that informing Burns of the molestation allegations without providing notice to the Kennedys and falsely promising police protection would violate the Kennedys' constitutional rights. *Id.* Ultimately, the *Kennedy* Court concluded that, as in *Grubbs*, the officer was on notice that it would be a violation to "create an opportunity for Burns to assault Kennedy that would not have otherwise existed." *Id.*

The incident in question here occurred in March 2001, meaning the general existence of the state-created danger doctrine was clearly established as described in *Kennedy*. *Id.* at 1144 (state-created danger exception clearly established as of 1998). The narrower question is whether, assuming Officer English did violate Plaintiff's constitutional rights, it was clearly established that a reasonable officer would conclude that Officer English's "conduct" on the evening of March 23, 2001, was a violation. The answer is certainly no. To assume that Officer English violated Plaintiff's rights, this Court would have to conclude that mere inaction in the face of a known or suspected danger is enough to constitute a state-created danger. No court in the Ninth Circuit has adopted such reasoning and, in fact, *DeShaney* holds just the opposite. And as discussed above, *Pena* is insufficient both because the incident in *Pena* occurred after the incident in this case and the *Pena* Court held that the right it articulated was not clearly established as of August 2001. There is no prior basis to conclude that Officer English was violating Plaintiff's Fourteenth Amendment rights when he spoke to Storm, asked for Storm's ID, and gave Storm a cigarette. Accordingly, the Court concludes that Officer English is also entitled to qualified immunity as to the state-created danger doctrine claim on the grounds the right Plaintiff asserts, even if it existed, was not clearly established as of March 23, 2001. Defendants' motion for summary judgment as to the section 1983 claim against Officer English is GRANTED.

### B. Municipal Liability Under 42 U.S.C. § 1983

To hold a municipality liable under section 1983 for the actions of an officer, the plaintiff must (1) demonstrate a constitutional deprivation, and (2) show that the deprivation was visited pursuant to a municipality custom or policy. *See Munger*, 227 F.3d at 1087 (citations omitted). Because the Court concludes that there was no constitutional violation under the analysis discussed above, there is no municipal liability under section 1983. Defendants' motion for summary judgment as to the section 1983 claim against the City of Morton is GRANTED.

## II. Plaintiff's Negligence Claims

In addition to her section 1983 claims, Plaintiff brings common law negligence claims against the Defendants. In the recent *Sheikh v. Choe*, the Washington State Supreme Court described the basic negligence considerations as follows:

The elements of negligence include the existence of a duty to the plaintiff, breach of that duty, and injury to the plaintiff proximately caused by the breach. Whether or not the duty element exists in the negligence context is a question of law....

· · · · ·

As a general rule, the common law imposes no duty to prevent a third person from causing physical injury to another. Additionally, under the public duty doc-

trine, the State is not liable for its negligent conduct even where a duty does exist unless the duty was owed to the injured person and not merely the public in general.

128 P.3d 574, 577 (Wash.2006) (citations omitted).

### A. Negligence Claim Against Officer English

 To avoid the general prohibition against liability under the public duty doctrine, Plaintiff relies on the "failure to enforce" exception. The failure to enforce exception establishes a duty "where governmental agents responsible for enforcing statutory requirements [1] possess actual knowledge of a statutory violation, [2] fail to take corrective action despite a statutory duty to do so, and [3] the plaintiff is within the class the statute is intended to protect." *Bailey v. Forks*, 108 Wash.2d 262, 268, 737 P.2d 1257 (1987) (citations omitted). This exception must be construed narrowly and, to fall within the exception, the statute in question must create a mandatory duty to take specific action to correct a violation. *Smith v. City of Kelso*, 112 Wash.App. 277, 282, 48 P.3d 372 (2002) (citations omitted).

Plaintiff raises negligence claims under the failure to enforce exception on what appears to be two theories. First, Plaintiff alleges that Officer English owed her a duty to enforce the intoxicated minor statute in RCW 66.44.270. Second, Plaintiff alleges that Officer English owed her a duty to enforce the driving under the influence ("DUI") statute in RCW 46.61 et seq. Defendants contend that these claims are foreclosed as a matter of law because (1) Plaintiff is not within the class of people the intoxicated minor statutes are intended to protect, meaning Plaintiff's claim fails as to the third element of the failure to enforce exception; and (2) Plaintiff provides no facts from which a reasonable jury might infer that Officer English could have arrested Storm under the DUI statutes and, therefore, Officer English had no actual knowledge of a violation. The Court examines each basis for Plaintiff's negligence claim in turn.

### 1. Intoxicated Minor Statute

 Defendants argue that Plaintiff may not rely on RCW 66.44.270 for her "failure to enforce" negligence claim because RCW 66.44.270 is designed and intended to protect minors who may become intoxicated, not third parties who may be harmed by minors who are intoxicated (i.e., that Plaintiff is not within the class to be protected by the statute). Def.'s Mot., at 16–17. RCW 66.44.270(2)(a) makes it "unlawful for a person under the age of twenty-one years to be in a public place, or to be in a motor vehicle in a public place, while exhibiting the effects of having consumed liquor." The statute defines "exhibiting the effects of having consumed liquor" as (1) "a person has the odor of liquor on his or her breath *and*" (2) is either (i) "in possession of or close proximity to a container that has or recently had liquor in it"; or (ii) "by speech, manner, appearance, behavior, lack of coordination, or otherwise, exhibits that he or she is under the influence of liquor." *Id.* (emphasis added).[5]

---

**5.** Defendants argue elsewhere that, even if Storm were in violation of RCW 66.44.270, he could not have been arrested by Officer English. This assertion is incorrect as it is based on *State v. Hornaday*, 105 Wash.2d 120, 130, 713 P.2d 71 (1986), which was effectively overruled by statutory amendments to both RCW 66.44.270 and RCW 10.31.100 (permitting arrests for misdemeanor violations of RCW 66.44.270). *See State v. Roth*, 128 P.3d 114, 118 (Wash.Ct.App.2006). Under these statutes, Officer English could have arrested Storm for being an intoxicated minor, but this does not answer the central question of whether Plaintiff was in the class of persons to be protected by RCW 66.44.270 under the

Defendants rely on *Hostetler v. Ward*, in which the Washington State Court of Appeals reviewed the dismissed claims of a motorcyclist who was injured by an intoxicated minor driving after having consumed alcohol in a county park. 41 Wash.App. 343, 347, 704 P.2d 1193 (1985), *rev. denied*, 106 Wash.2d 1004 (1986). After the minor in *Hostetler* had consumed a large quantity of beer, "a county official 'gave notice to [the minor] and others of the park's impending closure and directed their transportation to the public roadway." *Id.* The minor then proceeded to his vehicle, drove away, and eventually collided with the motorcyclist. *Id.* In *Hostetler*, the Court stated that RCW 66.44.270 "appears to have been designed to protect minors from injuries resulting from their abuse of alcoholic beverages, not to protect third parties injured by intoxicated minors." *Id.* at 354, 704 P.2d 1193. The *Hostetler* Court made this statement in its analysis of a negligence per se claim raised by the plaintiff. Additionally, addressing a "failure to enforce" claim, the *Hostetler* Court stated that "with regard to the liquor control laws that allegedly were not enforced [i.e., RCW 66.44.270], plaintiff has cited no authority, and we are aware of none, that provides a clear statement of legislative intent to identify and protect a particular circumscribed class of persons of which Gerald Hostetler is a member." *Id.* at 362, 704 P.2d 1193.

In her opposition brief, Plaintiff offers no meaningful response to *Hostetler*, instead stating as follows:

> However one looks at the statutory framework for driving, alcohol and minors (under the age of 21), including RCW 10.31.100, if Officer English had actual knowledge of Brad Storm's intoxicated state, he violated a duty owed to a class of persons which includes Plaintiff Jamison. This is inarguable. Plaintiff

failure to enforce exception to the public duty

is not merely relying on RCW 66.44.270. She is relying on the entire array of statutory violations committed by Brad Storm and observed by Officer English. Pl.'s Opp., at 19. Yet at oral argument Plaintiff's counsel suggested that *Hostetler* is distinguishable because it cited to an overruled Court of Appeals decision in *Bailey v. Forks*, 38 Wash.App. 656, 688 P.2d 526 (1984), *overruled by*, 108 Wash.2d 262, 737 P.2d 1257 (1987). Plaintiff is correct only insofar as the *Hostetler* decision did cite to the Court of Appeals' *Bailey* decision. *See* 41 Wash.App. at 361–63, 704 P.2d 1193 (four citations to *Bailey*). However, the *Hostetler* Court did not rely on *Bailey* for either of the propositions cited by Defendants—namely, that the minor in possession and intoxicated minor statutes are not intended to protect third-parties such as Plaintiff. *Hostetler* remains good law. Moreover, when asked, Plaintiff's counsel conceded that they could cite no case in Washington State suggesting that the statutes in question are intended to protect third parties. For all of these reasons, the Court concludes that Plaintiff cannot establish that she is within the class of persons intended to be protected by RCW 66.44.270, and that this forecloses a "failure to enforce" exception to the public duty doctrine. Therefore, Plaintiff's negligence claim based on RCW 66.44.270 fails as to the "duty" element as a matter of law.

**2. DUI Statutes**

■ In *Bailey*, the Washington State Supreme Court addressed the failure to enforce elements in the context of an intoxicated driver who was allegedly allowed by the police to continue driving and subsequently hit a motorcyclist. 108 Wash.2d at 264, 737 P.2d 1257. The *Bailey* Court took review of the issue after a Rule 12(c)

doctrine.

motion to dismiss on the pleadings, meaning the Court accepted all of the plaintiff's allegations as true. *Id.* Bailey alleged that a Town of Forks police officer came into contact with Medley, who was intoxicated, and that the officer knew or should have known of Medley's intoxication. *Id.* Bailey further alleged that the officer "personally observed [Medley] enter his truck 'behind the wheel' before later hitting Bailey and another person on their motorcycle." *Id.* at 265, 737 P.2d 1257. The Court held that Bailey had alleged facts that could satisfy all three elements of the failure to enforce exception if true. *Id.* at 269, 737 P.2d 1257.

The dispute in this case centers on whether Officer English had actual knowledge of Storm's violation of the DUI statutes. Assuming Officer English had actual knowledge of a DUI violation, there is no question that Officer English failed to take corrective action nor that Plaintiff was in the class of persons the DUI statutes were intended to protect, as established in *Bailey*. Thus, for Plaintiff to demonstrate that Officer English had a duty in the negligence context, she must provide "significant and probative evidence" from which a jury might reasonably conclude that Officer English had actual knowledge that Storm was driving under the influence. The "actual knowledge" element is generally a question of fact for the jury and, as with other facts, may be established by circumstantial evidence. *Waite v. Whatcom County,* 54 Wash.App. 682, 686–87, 775 P.2d 967 (1989).

Although Plaintiff does not specify the particular provisions, the DUI statutes in question appear to be RCW 46.61.502 and RCW 46.61.503. A person is guilty of DUI if a person *"drives a vehicle"* (1) and has an alcohol concentration of .08 or higher within two hours after driving or (2) while the person is under the influence of or affected by intoxicating liquor or any drug.

RCW 46.61.502 (emphasis added). Additionally, a person is guilty of DUI if the person *"operates or is in physical control of a motor vehicle"* while the person is (1) under the age of twenty-one and (2) has an alcohol concentration of at least .02 within two hours after operating or being in physical control of a motor vehicle. RCW 46.61.503 (emphasis added).

 Defendants raised the rather salient point that, at a minimum, Plaintiff's actual knowledge evidence must establish that Officer English had probable cause to arrest Storm for a DUI violation. Without at least having probable cause, Officer English could not have made a lawful arrest and, thus, could not have had "actual knowledge" of a statutory violation. In Washington State, probable cause exists when the facts and circumstances known to an arresting officer are sufficient to convince a reasonable person that a crime has been committed and that the person to be arrested committed the crime. *State v. Cerrillo,* 122 Wash.App. 341, 350, 93 P.3d 960 (2004). Establishment of probable cause does not require evidence sufficient to show guilt beyond a reasonable doubt. *Id.* at 350–51, 93 P.3d 960. The probable cause determination is not governed by a "mechanical rule" but, rather, courts look to "the total facts of each case, viewed in a practical, nontechnical manner." *State v. Gillenwater,* 96 Wash.App. 667, 671, 980 P.2d 318 (1999).

Defendants contend that Officer English could not have had probable cause to arrest Storm for a DUI violation because the record is devoid of evidence that he witnessed Storm drive or operate a vehicle, which is a prerequisite for DUI violations under both RCW 46.61.502 and RCW 46.61.503. Accepting the allegations and evidence in the light most favorable to the Plaintiff, Officer English was aware that Storm was intoxicated while they spoke for

up to 7–10 minutes.[6] Storm states that Officer English had seen Storm driving in Storm's pick-up on previous occasions and would have been aware that the pick-up parked 50–60 feet away that night was Storm's. Plaintiff also relies primarily on the statement in Officer English's Incident Report that he "was standing outside having a cup of coffee when Brad Storm and a couple of girls pulled in to get fuel" and, later, "Brad and the girls left the area." Sullivan Decl., Ex P (Incident Report at 1). The basis for these Incident Report statements is not clear. On the one hand, Officer English wrote this report following a post-accident interview with Storm, which means Officer English could have been merely repeating a statement made by Storm. On the other hand, the statement could be based on Officer English's personally having witnessed Storm "pull[ ] in to get fuel" at the Gas Plus. This is a question of fact, as is Officer English's credibility in explaining how he came to know that Storm "pulled in to get fuel." If a jury concluded that Officer English witnessed Storm drive into the Gas Plus, and subsequently recognized that Storm was intoxicated, Officer English would have had probable cause to arrest Storm for a DUI violation. Accordingly, Defendants' motion for summary judgment is DENIED as to Plaintiff's negligence claim against Officer English.

### 3. Qualified Immunity for Officer English

 Defendants raise an additional issue as to whether Officer English is entitled to qualified immunity as to the negligence claim under state law. In Washington State, a police officer is entitled to qualified immunity from tort liability "if

the officer was (1) carrying out a statutory duty, (2) according to procedures dictated to him by statute and superiors, (3) while acting reasonably." *Dang v. Ehredt*, 95 Wash.App. 670, 680, 977 P.2d 29 (1999). Defendants argue that "Officer English acted reasonably at all times during the incident in question" because Officer English did not "observe anything in Mr. Storm's behavior that gave him a reasonable and articulable suspicion to detain and/or arrest him." Def.'s Mot. at 19–20. In response, Plaintiff contends that the reasonableness of Officer English's actions on March 23, 2001, is a question of fact that is in dispute. Plaintiff is correct. Accepting her factual evidence as true, there is a genuine dispute as to whether Officer English should have detained and/or arrested Storm for a DUI violation. Defendants' motion for summary judgment is DENIED as to their qualified immunity defense for negligence.

### B. Negligence Claim Against the City of Morton

 Plaintiff alleges that the "City of Morton owed a duty to Plaintiff to train and supervise and otherwise control its police officers in the enforcement of statutory requirements and other matters incidental to the exercise of police functions." Compl. ¶ 52. Defendants contend that the public duty doctrine establishes that the City of Morton owed no duty to Plaintiff to "supervise or otherwise control" Officer English. Plaintiff offers no meaningful opposition to this argument, stating only that her "*Bailey v. Forks* claim has been established for the purposes of defeating defendants' motion for summary judgment." Pl.'s Opp., at 23. While *Bailey* does apply

---

**6.** At Storm's criminal trial, Officer English testified that Storm's "level of intoxication was far greater than it was the first time I had seen him." Sullivan Decl., Ex F (Officer English Testimony at 141). Giving Plaintiff all reasonable inferences, this statement suggests that Storm exhibited some level of intoxication during his first encounter with Officer English.

to the claim against Officer English under the failure to enforce exception to the public duty doctrine, *Bailey* did not implicate a failure to supervise or control claim against a municipality.

Plaintiff does cite a litany of facts in support of her contention that she may bring a section 1983 claim against the City of Morton for failing to train, supervise, or control Officer English. Pl.'s Opp., at 19–23. However, in the negligence context, these facts speak only to whether the City of Morton was in *breach of a duty* owed to Plaintiff and does nothing to answer the threshold question of whether such a duty even exists. The Court concludes that Plaintiff's claim against the City of Morton fails as a matter of law because Plaintiff has not established that she was owed a duty of adequate supervision and control, and no such duty appears to exist under the exceptions to the public duty doctrine. Defendants' motion for summary judgment as to Plaintiff's negligence claim against the City of Morton is GRANTED.

*Conclusion*

Plaintiff has not raised an issue of fact as to whether her constitutional rights were violated by Officer English under the state-created danger doctrine. Even if a viable constitutional right existed, Officer English would be entitled to qualified immunity because that right has not been clearly established as it relates to the circumstances of this case. Defendants' motion for summary judgment as to the 42 U.S.C. § 1983 claim against Officer English, docket no. 19, is GRANTED. Because there is no section 1983 claim against Officer English, Plaintiff's section 1983 claim against the City of Morton also fails. Defendants' motion for summary judgment as to the section 1983 claim against the City of Morton is GRANTED.

Under *Bailey,* Plaintiff has established that there is a disputed issue of material fact as to whether Officer English had "actual knowledge" that Storm was violating the DUI laws in proximity to their encounter on March 23, 2001. There is also an issue of fact as to whether Officer English's action or inaction that night was "reasonable" under the state qualified immunity test. Accordingly, Defendants' motion for summary judgment as to the negligence claim against Officer English is DENIED. Plaintiff has not established that the City of Morton had a duty to supervise or otherwise control Officer English that ran to Plaintiff under the public duty doctrine. Defendants' motion for summary judgment as to the negligence claim against the City of Morton is GRANTED.

Finally, with regard to the motions to strike, the Court DENIES Defendants' motion to strike the Storm Declaration. Docket no. 28. However, the Court did not consider inadmissible statements in the Storm declaration for purposes of this motion. The Court DENIES Plaintiff's motion to strike Defendants' reply brief as untimely. Docket no. 31.

IT IS SO ORDERED.